**Tomas Chapa YZAGUIRRE, et al., Petitioners,**

**v.**

**KCS RESOURCES, INC., Respondent.**

No. 00–0829.

Supreme Court of Texas.

Argued April 4, 2001.

Decided June 21, 2001.

Rehearing Overruled Aug. 30, 2001.

Donato D. Ramos, Person Whitworth Ramos Borchers & Morales, Laredo, Dick Watt, Houston, for Petitioner.

Charles R. Roberts, Jeffers & Bannack, San Antonio, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court.

When royalty payments are based on market value under an oil and gas lease in Texas, the lessee owes royalties based on the price of gas on the open market, even though the gas was actually sold for less than this price under a long-term sales contract. *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 871 (Tex.1968). In this case, we must decide whether the open-market price is still the correct measure

under such a lease when the lessee sells the gas for *more* than market value under a long-term sales contract. The royalty owners argue that the lessee breached express and implied duties by paying royalty on the open-market value rather than the greater amount actually realized. The district court, concluding that the market-value royalty clause controlled, disagreed with the royalty owners and granted summary judgment for the lessee. The court of appeals affirmed. 47 S.W.3d 532. We also conclude that the plain language of this lease requires the lessee to pay royalties based on fair market value, not on the price the lessee actually receives for selling the gas. We therefore affirm the judgment of the court of appeals.

## I.

In 1973, the petitioners or their predecessors in interest granted oil and gas leases in Zapata County to the predecessor of KCS Resources, Inc. The leases include a bifurcated royalty clause, providing that the royalty for gas sold at the wells is based on the "amount realized," while the royalty for gas sold off the premises is based on "market value." In 1979, KCS entered into a 20–year gas purchase agreement ("GPA") with Tennessee Gas Pipeline Co., under which Tennessee agreed to purchase gas at a set price from the Zapata County leases. The GPA specified that the point of sale was to be a processing plant several miles away from the leased property. Because KCS's sales to Tennessee took place away from the property, the GPA sales triggered the clause in the oil and gas leases that obligated the lessee to pay a market-value royalty on gas sold off the premises. KCS paid royalties for production from one gas well based on the GPA price until 1994, although it paid market-value royalties for its two other wells.

For many years, gas production from the leases was minimal, but large production resulted after the Bob West field was discovered in 1990. Meanwhile, automatic price escalations in the GPA caused the GPA price to far exceed the market value of the gas. Tennessee sued for a declaratory judgment that the GPA did not obligate it to purchase all of the gas from the leases at the GPA price. That action was eventually resolved in favor of the producers, including another predecessor of KCS. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565 (Tex.1996).

While Tennessee's suit was still pending, two other producers who held interests in the same leaseholds sued the royalty holders for a declaratory judgment that they need only pay royalty based on market value rather than the higher GPA price. KCS intervened in that suit a week later, seeking the same relief. Tomas Chapa Yzaguirre and the other royalty owners (collectively, "the Royalty Owners") counterclaimed against KCS with a variety of fraud and contract claims. The Royalty Owners also filed a plea in abatement and a motion to transfer venue from Dallas County to Zapata County. KCS moved for summary judgment that it owed royalty payments based only on the value of the gas on the open market.

The district court denied the Royalty Owners' plea in abatement and motion to transfer, then granted KCS's motion for partial summary judgment, leaving only the determination of market value for trial. The parties then filed a joint motion for a ruling on the admissibility of appraisal testimony by the Royalty Owners' expert, who proposed to testify that the price KCS received under the GPA was also the market value of the gas. The court excluded this testimony because the GPA price was not a comparable sale that showed market value. Because the Royalty Owners other-

wise stipulated to market value, the court rendered final judgment in favor of KCS. The court of appeals affirmed. 47 S.W.3d 532. Having abandoned their arguments below regarding division orders, estoppel, waiver, laches, and various tort claims, the Royalty Owners now appeal to this Court on issues of venue, the measure of the gas royalties, and the admissibility of sales made under the GPA to show market value.

## II.

■ We must first decide whether venue was appropriate in Dallas County, even though the mineral estates at issue are located in Zapata County. The Royalty Owners argue that venue is mandatory in Zapata County, where the real property lies, under section 15.011 of the Texas Civil Practice and Remedies Code. At the time this suit began, that section provided:

> Actions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, or to quiet title to real property shall be brought in the county in which all or a part of the property is located.

Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3247 (amended 1995) (current version at TEX. CIV. PRAC. & REM.CODE § 15.011).[1] The Royalty Owners argue that the nature and extent of their royalties is a question of their "interest in real property," so that section 15.011 required venue to be in Zapata County. We disagree.

Although oil and gas leases are an interest in real property, the applicable version of section 15.011 applied only when ownership of the property was in dispute. *See, e.g., Maranatha Temple, Inc. v. Enterprise*

*Prods. Co.*, 833 S.W.2d 736, 738 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Scarth v. First Bank & Trust Co.*, 711 S.W.2d 140, 141–42 (Tex.App.—Amarillo 1986, no writ). KCS and the Royalty Owners do not dispute ownership of the royalty interests or the extent of those interests, as was the case in *Renwar Oil Corp. v. Lancaster*, 154 Tex. 311, 276 S.W.2d 774 (1955). There, the royalty owners sought a declaratory judgment fixing their royalties. *Lancaster v. Renwar Oil Corp.*, 270 S.W.2d 289, 292 (Tex.App.— Dallas 1954), *rev'd*, 154 Tex. 311, 276 S.W.2d 774 (1955). Contrary to the court of appeals, we concluded that venue was mandatory in Nueces County because the royalty determination necessarily depended on resolving a dispute over the lease's boundaries. 276 S.W.2d at 776. The substance of the dispute in the present case is about the obligations KCS owes to the Royalty Owners under the terms of the leases, not the boundaries of the leases or the percentage of the Royalty Owners' royalties. *See, e.g., Texas Oil & Gas Corp. v. Moore*, 630 S.W.2d 450, 452–53 (Tex. App.—Corpus Christi 1982, writ dism'd w.o.j.) ("[C]laims for past and accrued royalties are properly characterized as claims to recover personalty and, therefore, do not meet the requirements of [the predecessor to § 15.011].") Because the suit does not involve recovering real property or quieting title, the court of appeals correctly concluded that the mandatory venue provisions of the former version of section 15.011 do not apply.

## III.

■ We turn now to this case's central question, which is how to measure the royalty KCS owes to the Royalty Owners

---

1. Suits to recover damages to real property are also subject to mandatory venue under the current version of section 15.011.

under the 1973 leases. KCS urges that it owes the Royalty Owners a market-value royalty, which is a royalty based on the prevailing market price at the time of sale. *Vela,* 429 S.W.2d at 871. Market value may be wholly unrelated to the price the lessee receives as the proceeds of a sales contract. *Id.* But the Royalty Owners contend that producers have always based "market-value" royalty payments on actual sales proceeds, so that the leases already require KCS to pay royalties based on the GPA price.[2] We agree with KCS.

The royalty clause of each lease at issue states:

> The royalties to be paid by Lessee are: . . . on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale. . . .

The leases therefore provide "market value" and "amount realized" as the two measures of the royalties due to the Royalty Owners, depending upon whether the sale is made on or off the premises. The Royalty Owners claim that the distinction between these types of royalties lies in what costs are deducted before calculating the royalty, not in the rate on which the royalty is based. In their view, both amount-realized and market-value royalties start with the price the producer actually receives for the gas, with the difference being that the lessee subtracts transportation

costs from the proceeds before paying a market-value royalty.

We disagree. The parties to these leases, in unambiguous terms, based the royalty on the amount realized for gas sales at the well and on market value for sales that occurred off the premises. These provisions are similar to the royalty terms in *Texas Oil & Gas Corp. v. Vela,* in which the oil and gas leases provided for a market-value royalty for off-premises sales and a proceeds-based royalty for sales of gas at the well. *Id.* at 868; 870–71. Because the lessee in *Vela* sold the gas produced off the premises, the royalty owners claimed they were owed a market-value royalty, rather than a much lower royalty based on the proceeds the lessee actually received under a long-term sales contract. *Id.* at 868.

To resolve this dispute, we looked to the plain terms of the lease:

> [The parties] might have agreed that the royalty on gas produced from a gas well would be a fractional part of the amount realized by the lessee from its sale. Instead of doing so, however, they stipulated in plain terms that the lessee would pay one-eighth of the market price at the well of all gas sold or used off the premises. This clearly means the prevailing market price at the time of the sale or use.

*Vela,* 429 S.W.2d at 871; *see also Amoco Prod. Co. v. First Baptist Church of Pyote,* 611 S.W.2d 610, 610 (Tex.1980) ("The parties can draft either a 'market value' or a 'proceeds' royalty provision, and their intent will be followed by the courts."). Because the *Vela* lease's plain terms specified a market price royalty, we rejected the

---

**2.** In 1991, the Legislature passed a statute defining "market value" and similar terms in oil and gas leases to mean "the amount realized at the mouth of the well by the seller of such production in an arm's-length transaction." Tex. Nat. Res.Code § 91.402(i). The Royalty Owners point out that the statute is consistent with their argument, but they do not argue that it controls our analysis of their 1973 leases.

lessee's argument that "the market price of gas within the meaning of the lease is the price contracted for in good faith by the lessee in pursuance of its duty to market gas from the premises." 429 S.W.2d at 870. Instead, we held that the plain terms of the lease required the lessee to pay a market-value royalty even though the lessee received less than market value under its long-term sales contract. *Id.* at 871; *see also Exxon Corp. v. Middleton,* 613 S.W.2d 240, 245 (Tex.1981) (amount realized under a sales contract does not affect the lessor's royalty obligations under a market-value clause). The same plain terms that fix the lessee's duty to pay royalty also define the benefit the lessor is entitled to receive. Thus, under the leases, Yzaguirre and the other Royalty Owners are entitled to a market-value royalty, not an amount-realized royalty.

### IV.

■■■■ The Royalty Owners next argue that by not paying royalties based on the proceeds received under the GPA, KCS has breached its implied covenant to reasonably market the oil and gas. Texas law has long recognized that an oil and gas lease imposes duties on the lessee that extend beyond the terms of the lease itself if the lease is silent on certain subjects. These implied covenants may include duties to develop the premises, protect the leasehold, and manage and administer the lease. *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567 & n. 1 (Tex.1981). Included within the implied covenant of management and administration is the duty to market the oil and gas reasonably. *Id.* However, there is no implied covenant

when the oil and gas lease expressly covers the subject matter of an implied covenant. *See Id.* at 567 ("Since the early history of oil and gas litigation, the courts have held that covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and to protect the lease."); *Danciger Oil & Refining Co. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941) ("[W]hen parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole.").

Relying primarily on *Amoco Production Co. v. First Baptist Church of Pyote,* 611 S.W.2d 610 (Tex.1980), the Royalty Owners claim that the implied covenant to reasonably market the oil and gas means that the producer must attempt to obtain the best price available for the benefit of the royalty owner.[3] But *Pyote* does not support the Royalty Owners' contention. In *Pyote,* the owners of a proceeds royalty claimed that the producer had acted in bad faith in selling the gas at a rate substantially below market value. 611 S.W.2d at 610. Under these circumstances, we agreed that the lessee could be liable for breaching the implied covenant to market the lessors' gas. *Id.* We cautioned, however, that this holding did not create "an absolute duty to sell gas at market value under a 'proceeds' royalty clause." *Id.* We concluded that while "failure to sell at market value may be relevant evidence of a breach of the covenant to market in good

---

**3.** The Royalty Owners do not argue that KCS breached the covenant to market reasonably by selling the gas away from the leased property in order to reduce the royalties it owed to the Royalty Owners. Although the leases' bifurcated royalty clause would have based royalties on actual proceeds if the sales had occurred at the well, KCS agreed to off-premises sales in the 1979 GPA, long before it could have known the GPA price would exceed the market price of gas.

faith," such failure "is merely probative and is not conclusive." *Id.*

In this case, the parties entered into a lease requiring a market-value royalty. Because the lease provides an objective basis for calculating royalties that is independent of the price the lessee actually obtains, the lessor does not need the protection of an implied covenant. Depending on future market behavior, this may be financially beneficial to the lessor, as it was in *Vela*, or it may be less advantageous, as here. In either event, the parties have received the benefit of their bargain.

The Royalty Owners urge that this result is contrary to our decision in *Cabot Corp. v. Brown*, 754 S.W.2d 104 (Tex.1987). In that case, the Court stated that "[u]nder a gas royalty clause providing for royalties based on market value, the lessee has an obligation to obtain the best current price reasonably available." *Id.* at 106. But *Cabot* was decided on the basis of division orders, not whether the implied covenant required the lessee to pay royalty based on the best available price; thus the language in question was not necessary to the decision. Moreover, as support for the quoted statement, the Court cited a treatise that actually states that a market-value royalty is based on "the best current *market* price reasonably available." Richard W. Hemingway, *Law of Oil and Gas* § 8.9(C) at 443 (2d ed.1983) (emphasis added). Under these circumstances, we do not believe the *Cabot* dicta should override the plain import of our decisions in *Vela, Pyote,* and *Middleton.*

■ Essentially, the Royalty Owners wish to use an implied marketing covenant to negate the express royalty provisions in the leases and transform the "market value" royalty into a "higher of market value or proceeds" royalty. The Royalty Owners conceded as much at oral argument, stating that "the entire body of implied covenant law has been aimed at ... making sure the royalty owner gets the best deal." We disagree. The implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's self-dealing or negligence. *See Pyote*, 611 S.W.2d at 610. It does not override the express terms of the oil and gas lease whenever a lessee negotiates a sales contract that turns out to be especially lucrative. We will not now rewrite this lease's plain terms to give the Royalty Owners the benefit of a bargain they never made.

### V.

■ Finally, the Royalty Owners argue that, even if their leases provide for a market-value royalty, the price KCS receives from Tennessee under the GPA is relevant to the determination of market value. In the Royalty Owners' view, the price a producer receives under a gas sales contract is always relevant to prove the gas's market value. Like the courts below, we reject this contention.

■ The meaning of "market value" is well established in our jurisprudence:

> Market value is defined as the price property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it. To determine the market value of gas, the gas should be valued as though it is free and available for sale.

*Middleton*, 613 S.W.2d at 246 (citation omitted). Market value is the prevailing market price at the time of delivery and is not affected by a price set at the time the lessee enters into a long-term sales contract with the buyer. *Id.* at 244–45; *Vela*, 429 S.W.2d at 871.

According to the 1979 GPA, Tennessee was obligated to purchase KCS's gas at an ever-escalating price, regardless of its val-

ue on the open market. The gas was not free and available for sale, and its price was negotiated in 1979, not contemporaneously with the deliveries. Under these circumstances, the GPA price is not evidence of market value, and the trial judge properly excluded it.

For these reasons, we affirm the judgment of the court of appeals.

Justice O'NEILL did not participate.