

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00054-CV

———————————————

TOTALENERGIES E&P USA, INC., Appellant

V.

DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD, CITY OF
DALLAS, AND CITY OF FORT WORTH, Appellees

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-286059-16

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

While this case involves a complicated factual and procedural history, the question before us is a simple one: Can the contractual obligation here to drill "fourteen new wells" be satisfied by drilling vertical as opposed to horizontal wells? Because we hold that it can under the contract's plain language, we reverse the trial court's judgment and render the judgment that the trial court should have rendered.

## I.  BACKGROUND

In 2006, appellee Dallas/Fort Worth International Airport Board, appellee City of Dallas, appellee City of Fort Worth (collectively, DFW), and Chesapeake Exploration, L.L.C. entered into an oil and gas lease under which Chesapeake was granted the exclusive right to explore, drill, and produce oil and gas on DFW's land.[1] The lease contained a section entitled "**Continuous Development**" (section 10) that addressed reasonable development and retained acreage, allowing Chesapeake to, at the end of the lease term, retain acreage around each producing well and release the remainder or retain all leased acreage by continuously developing the leasehold. The lease dictated different sized retained acreage based on whether the drilled well was vertical or horizontal. A horizontal well was defined as a well "that meets the definition of a 'horizontal drainhole well' under Statewide Rule 86 of the Railroad Commission of Texas." A vertical well was simply defined as "a well that is not a

---

[1]Chesapeake was severed from this appeal after entering bankruptcy and being ordered by the bankruptcy court to voluntarily dismiss its appeal.

2

horizontal well." Paragraph 10(b) of section 10 required Chesapeake to maintain "a minimum of five (5) rigs" on the leasehold to continue the lease beyond the primary term.

Years later, DFW, Chesapeake, and appellant TotalEnergies E&P USA, Inc. (Total)[2] ratified a lease amendment that altered paragraph 10(b) to allow Total and Chesapeake to maintain the lease provided they drilled "fourteen new wells" over a two-year period (the drilling commitment). The other paragraphs of section 10, including the differentiation between horizontal and vertical wells, were not amended. The original lease remained in full force and effect except to the extent that the amendment was contrary to an original lease term.

In 2015, after a "dramatic drop in gas prices," Chesapeake and Total set out to determine whether vertical or horizontal wells would be economically feasible to fulfill the drilling commitment in paragraph 10(b). Chesapeake determined that neither horizontal nor vertical wells would be profitable. In other words, "a reasonable and prudent operator would not have drilled a well on the airport within current pricing" at the time. Total reached a similar conclusion that there was "no economic justification" to drill any wells. But because vertical wells would lose less money than horizontal ones, Chesapeake informed DFW that it would drill vertical wells to fulfill

_____

[2]Total was a 19.33% working-interest assignee of Chesapeake's interest in the lease.

3

the drilling commitment, even though vertical wells had never before been drilled on the leasehold.

DFW filed suit seeking, among other things, a declaration that the drilling commitment required horizontal wells. After all claims, except the declaratory-judgment action, were settled by the parties, DFW and Total filed cross-motions for traditional summary judgment. DFW asserted that it was entitled to judgment as a matter of law on its claim because the lease either required horizontal wells or could not have been satisfied by vertical wells; Total argued that the drilling commitment could have been satisfied by vertical wells as a matter of law. The trial court granted DFW's summary-judgment motion, denied Total's cross-motion, and declared that the drilling commitment "require[d] the drilling of horizontal wells" and "[could not] be satisfied by the drilling of vertical wells." Total appeals.

## II. PROPRIETY OF SUMMARY JUDGMENT

### A. STANDARD AND SCOPE OF REVIEW

The standard of review for a traditional summary judgment is well established. *See* Tex. R. Civ. P. 166a(c). We review the judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). We take as true all evidence favorable to the nonmovant and indulge all reasonable inferences and resolve any doubts in the nonmovant's favor. *Id.* A traditional motion for summary judgment may be granted only when the movant establishes that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Mann*

4

*Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A plaintiff moving for summary judgment on its cause of action must conclusively prove all elements as a matter of law. *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001). When both sides move for summary judgment and the trial court grants one motion but denies the other, we are to review both sides' summary-judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013); *Holy Cross*, 44 S.W.3d at 566.

## B. CONTRACT CONSTRUCTION

In construing a contract, including an oil and gas lease, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005); *NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.). Our primary objective is to "ascertain and give effect to the parties' intent" as expressed in the contract. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). Because we "presume parties intend what the words of the contract say," we look to "[o]bjective manifestations of intent," and not to what the parties later allege they "intended to say but did not." *Id.*; *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126–27 (Tex. 2010); *see also First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (prohibiting reliance on extrinsic evidence to make contract "say what it unambiguously does not say"). And

5

we give unambiguous contract language its "plain, ordinary, and generally accepted meaning" unless the agreement directs otherwise. *URI*, 543 S.W.3d at 764; *see also Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) ("The most important consideration in interpreting a lease is the agreement's plain, grammatical language."). Here, neither side argues that the term "wells" contained in the lease is ambiguous, and we agree that it is not. Because the lease is not ambiguous on this point, neither the trial court nor this court can consider the parties' interpretation or extraneous evidence to determine the meaning of the term in section 10. *See URI*, 543 S.W.3d at 764–65.

## C. APPLICATION

Total argues that the lease's language neither restricts nor excludes any direction, type, or characteristic of the required wells in the drilling commitment and points to the lease provisions in section 10 applicable to horizontal and vertical wells to argue that both were included in the term "wells." DFW counters that because the leasehold is located in the Barnett Shale, efficient production is accomplished only through horizontal wells, which would have been the parties' understanding when executing the lease and its amendment.

Although the lease does not define "well," its commonly accepted meaning is "a shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained." *Kothmann v. Boley*, 308 S.W.2d 1, 3 (Tex. 1957); *accord Well*, Black's Law Dictionary (11th ed. 2019) (defining well as "[a]

6

hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas").

The lease does, however, define horizontal well and vertical well. Further, an examination of the lease reveals that "well," when it appears in the lease as a noun, is used in three general ways: (1) as modified by the word "horizontal," as in "horizontal wells"; (2) as modified by the word "vertical," as in "vertical wells"; and (3) standing alone, as in "the wells." For example, in a portion of section 10, i.e., paragraph 10(f), all three uses of the noun "well"[3] appear:

> (f) As used in the Lease the term "*horizontal well*" means one that meets the definition of a "*horizontal drainhole well*" under Statewide Rule 86 of the Railroad Commission of Texas, and a "*vertical well*" is a *well* that is not a *horizontal well*. The land assigned to a *well* for the purposes of this section is referred to as a "Retained Tract." A Retained Tract for a *well* may not exceed the minimum size required to obtain a drilling permit under the well density rules adopted by the Railroad Commission of Texas under the field rules for the field in which the *well* is completed, or if there are no field rules which apply to the *well*, then the Retained Tract shall be limited to the smallest size required to obtain a drilling permit under the statewide well density rules of the Railroad Commission of Texas. A Retained Tract for a *vertical well* producing from the Barnett Shale formation may not exceed forty (40) acres. If field rules are established later with well density provisions permitting a lesser number of acres for obtaining a drilling permit, a Retained Tract for a *vertical well* may not exceed the minimum size permitted under such revised or amended field rules. A Retained Tract for a *horizontal well* may include the minimum acreage specified for a *vertical well* plus the additional acreage listed in the tables in Rule 86 and must comply with the requirements of Rule 86 for minimum permitted well density, and if the *well* is producing from the Barnett Shale formation, the acreage assigned shall be based upon well density for *vertical wells* being forty (40) acres or

---

[3]"Well" is also used several times in this passage to refer to "well density rules" and "well density provisions." In this paragraph, well-density rules and provisions apply to both horizontal wells and vertical wells.

less. The designation of a Retained Tract shall not result in the Land comprising less than eighty percent (80%) of the net mineral acres in the Retained Tract for the *well* to which the Land has been assigned. [Emphases added.]

In this one paragraph, the lease employs the term "well" standing alone seven times, the terms "horizontal well" and "horizontal drainhole well" four times, and the term "vertical well" five times, thus demonstrating that when it stands alone, "well" is a generic, nonspecific term that can be modified by either "horizontal" or "vertical" when necessary to distinguish between the two. The plain language of the lease, therefore, shows that "well" is a generic, nonspecific term that can be modified by the terms "horizontal" or "vertical" when necessary to specify one, as opposed to the other.

But in the language of the drilling commitment, only "well" is used. At no point does the paragraph indicate that only horizontal wells could satisfy the commitment or that vertical wells were excluded from the wells referred to. And the remainder of the lease shows that the parties limited the type of well when necessary. While we recognize that vertical wells had never been drilled on the leasehold before and that the parties likely contemplated horizontal wells, we cannot go beyond the plain language of the lease to construe it in line with DFW's desired interpretation. *See Brumitt*, 519 S.W.3d at 110. Thus, the parties' intent as manifested by the plain language of the lease did not limit the drilling commitment to horizontal wells. *See, e.g.*, *XOG Operating, LLC v. Chesapeake Expl. Ltd. P'ship*, 554 S.W.3d 607, 612–13 (Tex.

8

2018); *Samson Expl., LLC v. Bordages*, No. 09-20-00174-CV, 2022 WL 120004, at *5 (Tex. App.—Beaumont Jan. 13, 2022, no pet. h.).

And we disagree with DFW that the implied covenant to reasonably develop the leasehold required horizontal wells or excluded vertical wells. The lease provided that its language would not "negate the usual implied covenants imposed upon a lessee." But the lease also contained an express provision regarding continuous development in section 10, specifically the drilling commitment in paragraph 10(b). The implied covenant to reasonably develop cannot supersede the express provisions of the lease governing development, which did not limit the drilling commitment to vertical or horizontal wells. *See Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 373 (Tex. 2001); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 889 (Tex. 1998). In short, "an oil and gas lease imposes [implied] duties on the lessee that extend beyond the terms of the lease itself *if* the lease is silent on certain subjects." *Yzaguirre*, 53 S.W.3d at 373 (emphasis added). The parties' lease was not silent regarding reasonable development.

### III. CONCLUSION

The plain language of the lease did not limit the drilling commitment to horizontal wells. Although the parties may have meant to so limit the drilling commitment, that was not reflected in the plain language of the lease. Total established its right to judgment as a matter of law based on the plain language of the lease and to a declaration that the drilling commitment can be satisfied by drilling vertical wells. Based on this conclusion, we need not address Total's evidentiary

9

arguments.  We sustain Total's first issue, reverse the trial court's summary judgment in favor of DFW, and render summary judgment in favor of Total with a declaration that the drilling commitment may be fulfilled by drilling vertical wells.  *See* Tex. R. App. P. 43.2(c).

/s/ Brian Walker

Brian Walker
Justice

Delivered:  March 24, 2022