# Supreme Court of Texas

---

No. 22-0878

---

Myers-Woodward, LLC,

*Petitioner*,

v.

Underground Services Markham, LLC and United Brine Pipeline Company, LLC,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

---

**Argued October 29, 2024**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

Extracting salt from an underground salt-rock formation can create large, empty caverns within the formation. These caverns are more than just an interesting geological byproduct of salt mining. Technological development has enabled the storage of oil and gas in them, which has made the right to use these "salt caverns" a valuable commodity. Agreements written before salt caverns became economically useful, including the mineral deed at issue in this case, had

little reason to allocate the right to use the empty spaces left behind by salt mining. This dispute arose because the mineral owner and the surface owner disagree over which of them has the right to use the salt caverns under the land to store oil and gas that is produced off-site and transported to the property.

As explained below, we agree with the court of appeals that, under the conveyances at issue here, the holder of the surface estate owns the empty underground spaces left behind by the mineral owner's salt mining. The mineral owner is of course entitled to make reasonable use of both the surface and the subsurface, including caverns, for the production of the property's minerals. But empty space is not a mineral, no matter how economically valuable it becomes. And storage of hydrocarbons produced off the property is not related, at least under these facts, to the mineral owner's production of salt on the property. Absent an agreement otherwise, ownership of underground salt does not include ownership of underground empty space within or around a salt formation. Nor does it include a right to use that empty space for purposes unrelated to the production of the property's minerals.

Although we agree with the court of appeals' conclusion regarding ownership and use of the salt caverns, we disagree with the lower courts' calculation of the surface owner's royalty payments. We therefore reverse that portion of the court of appeals' judgment. The judgment of the court of appeals is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

2

## I.

Petitioner Myers-Woodward, LLC (Myers) owns 160 acres in Matagorda County. In 1947, Myers's predecessors retained the surface estate but transferred the mineral estate to the predecessor of the Respondents, which are Underground Services Markham, LLC and United Brine Pipeline Company, LLC (collectively, USM). In the words of the 1947 mineral deed, USM's predecessor obtained:

> [an] (8/8ths) interest in all of the said oil, gas and other minerals in, on and under said land, together with all and singular the rights and appurtenances thereto in anywise belonging, with the right of ingress and egress and possession at all times for the purpose of mining, drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating, and transporting such minerals, and for housing and boarding employees, unto said grantee, his heirs, successors and assigns, forever . . . .

The 1947 mineral deed reserved to the surface owner "a perpetual one-eighth (1/8th) royalty on all oil that may be produced and saved from" the property, "the same to be delivered at the wells or to the credit of Grantors . . . into pipe line to which the wells may be connected." That same year, the parties executed a correction deed, which provides that the 1/8th royalty includes not just oil but also "a royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from" the property.

By 2008, Texas Brine Company held the mineral estate described in the 1947 mineral deed. In that year, USM acquired all of Texas Brine Company's interest in the salt on the property. The salt deed conveyed:

> [a]ll of [Texas Brine Company's] right, title and interest, in and to all of the salt and salt formations only, in, on and

3

under and that may be produced from the property described [herein].

. . . .

This Salt Deed is made and accepted subject to . . . any and all . . . royalty obligations . . . .

After several years of discussion, USM and the royalty holders were unable to agree on the royalty owed on produced salt brine. In 2013, USM sued the royalty holders, including Myers, seeking two declarations: (1) that USM's "royalty obligations . . . are discharged and satisfied by . . . tendering to the owners of the reserved interests at the well or into the pipeline to which the well is connected 1/8th of the salt brine produced in its natural state in which it is produced at the well"; and (2) that USM owns the cavern space created by its mining efforts in the salt formation underlying the property and that Myers has "no rights in and to any substances (not produced or originating from the Subject Tract or lands pooled therewith) stored in any caverns created in the salt mass or revenues derived therefrom."

After filing suit, USM began producing salt on the property. USM produced 2,674,058.90 tons of salt between 2015 and 2019, when production ceased. USM did not pay Myers any royalty. Myers filed a counterclaim seeking, among other things, recovery of unpaid royalties.

In 2015, the district court ruled that USM "is the owner of the subsurface caverns created by its salt mining activities on the Subject Tract." The court, however, denied USM's request for a declaration that USM has the right to inject into the caverns hydrocarbons and other minerals produced off-site. On that point, the court agreed with Myers's argument that "USM may use the Myers land only for the purposes specified in the 1947 deed," which are "mining, drilling and operating

4

for [salt] and the maintenance of facilities and means necessary or convenient for producing, treating, and transporting [salt], and for housing and boarding its employes."

As for the calculation of Myers's royalty, the district court ruled prior to trial that "[t]he Myers royalty owners are entitled to one-eighth royalty based on the market value of the salt at the point of production." The parties disagreed on how to apply that rule. According to USM, the salt's market value at the point of production was less than nine cents per ton. USM's expert witnesses based this amount on fixed-price royalty agreements elsewhere in southeast Texas and Louisiana, which USM argued were evidence of comparable sales establishing the salt's market value. According to Myers, however, comparable sales must be arm's-length transactions in which third-party purchasers actually bought and acquired Markham-Dome salt from USM. Myers's expert relied on sales from USM to Formosa Plastics Corporation and Occidental Chemical Corporation. After adjusting for post-production costs, the expert calculated a royalty of $1,333,901.00 for 2015–2017. After a bench trial, the court agreed with USM's calculations and concluded that Myers "is owed a total of $258,850.41," which the court found was "the fair market value of the salt at the wellheads on a 1/8ths basis."

The district court entered a final judgment to this effect, which incorporated its earlier ruling about the ownership and use of the salt caverns. Myers appealed. Among other things, it challenged (1) the ruling that its royalty is calculated based on market value at the wellhead, (2) the use of fixed-price royalty contracts as comparable sales

to establish the salt's market value at the point of production, and (3) the ruling that USM owns the caverns. USM cross-appealed, challenging the ruling that its right to use the caverns extends only to those uses described in the deed—"mining, drilling, and operating for [salt, etc.]" USM also argued that Myers waived its right to contest the ownership of the caverns.

The court of appeals affirmed in part and reversed in part. 699 S.W.3d 1, 16, 19 (Tex. App.—Corpus Christi–Edinburg 2022). As for the royalty, the court of appeals sided with USM, affirming the district court's calculations. As for ownership and use of the caverns, the court of appeals sided with Myers. Relying primarily on two prior decisions of this Court, the court of appeals held that Myers, as the owner of the surface estate, retains ownership of the non-mineral elements of the subsurface, including empty spaces. *Id.* at 18–19 (citing *Humble Oil & Refin. Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974), and *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017)). The court of appeals thus concluded that USM does not own the subsurface caverns and has no right to use them for purposes not specified in the deed.

The court of appeals acknowledged the potential tension between its decision and *Mapco, Inc. v. Carter*, 808 S.W.2d 262, 274 (Tex. App.—Beaumont), *rev'd in part on other grounds*, 817 S.W.2d 686 (Tex. 1991). In *Mapco*, the court of appeals held that "the continued ownership interest [of] the mineral estate in an underground storage facility is acknowledged and harmonious with the decisional law of our state." *Id.* at 278. *Mapco* notwithstanding, the court of appeals agreed with Myers

6

as to ownership of the salt caverns and reversed the district court's judgment on that point. 699 S.W.3d at 19. Both parties petitioned for review in this Court, and we granted the petitions.

## II.

## A.

We begin with the foundational question of who owns the salt caverns. As far as we are aware, with respect to these 160 acres, Myers owns every stick in the proverbial bundle except for the mineral interest conveyed by the corrected 1947 mineral deed. Under that deed, USM's predecessor obtained "all of the said oil, gas and other minerals in, on and under said land, together with all and singular the rights and appurtenances thereto in anywise belonging." Out of that broad mineral estate, USM obtained only the salt—"all of Grantor's right, title and interest, in and to all of the salt and salt formations only."

Although we refer to Myers's interest as the "surface estate" and to the interest that was severed and conveyed in 1947 as the "mineral estate," we caution that the rights encompassed by these general labels may vary depending on the language chosen by the parties to any particular conveyance. Not all mineral estates are created equal. Resolving a dispute over the scope of a mineral conveyance should therefore begin with the text of the conveyance—not with generalizations about the default nature of a "surface estate" or a "mineral estate." Doctrinal labels such as these—and the caselaw from which they derive—are of course very useful, indeed essential, when courts are confronted with questions not fully answered by the text of the conveyance.

7

The parties agree that USM owns the salt under the 160-acre tract. They also agree that Myers's surface estate includes not just the surface of the land, but also any portion of the subsurface that was not included in the 1947 conveyance of "all . . . oil, gas, and other minerals." The question, then, is whether empty spaces within salt formations, created decades later as a byproduct of salt production, were included within the 1947 conveyance of "other minerals" to USM's predecessors. Or, as USM frames it, whether its ownership of the "salt formations" includes the empty space created inside the salt formations by its salt-production efforts. If so, then USM owns those empty spaces. If not, then Myers owns them.

Myers relies principally on oil and gas cases, which of course make up the vast majority of Texas cases about mineral rights. With respect to oil and gas, this Court's prior decisions indicate that subsurface reservoirs or voids left behind after the production of oil or gas do not belong to the mineral estate, absent agreement otherwise. In *Humble Oil & Refining Co. v. West*, we drew a distinction between the "mineral estate" and "the matrix of the underlying earth, i.e., the reservoir storage space," which we suggested would remain with the surface-estate holder after severance of the mineral estate. 508 S.W.2d at 815. The distinction was not decisive in that case, however, because Humble Oil owned the land in fee simple, including both the surface and mineral estates. *Id.*

Years later, we reiterated the distinction in a case where it mattered more, *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*. That case arose because Anadarko wanted to drill through Lightning's

8

mineral estate to reach minerals in Anadarko's mineral estate. 520 S.W.3d at 43. We held that Lightning did not have the right to exclude Anadarko from physical underground spaces within Lightning's mineral estate so long as Anadarko's actions did not diminish Lightning's minerals or interfere with their development. *See id.* at 49–51. We observed that the mineral estate generally includes the right to "possess the minerals" but "do[es] not include the right to possess the specific place or space where the minerals are located." *Id.* at 49.

Even more recently, citing *Lightning Oil*, we wrote that "the surface owner, and not the mineral lessee, owns the possessory rights to the space under the property's surface." *Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 820 (Tex. 2021). Persuasive decisions from other courts applying Texas law reinforce the principle that empty underground space generally belongs to the surface estate. *See, e.g., Dunn–McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011) ("Texas law establishes that the holder of a mineral estate has the right to exploit minerals, but does not own the subsurface mass."); *Emeny v. United States*, 412 F.2d 1319, 1323 (Ct. Cl. 1969) ("The surface of the leased lands and everything in such lands, except the oil and gas deposits covered by the leases, [are] still the property of the respective landowners. This include[s] the geological structures beneath the surface, including any such structure that might be suitable for the underground storage of 'foreign' or 'extraneous' gas produced elsewhere." (citation omitted)).[1]

---

[1] *See also* 1 E. SMITH & J. WEAVER, TEXAS LAW OF OIL AND GAS § 2.1[B][3], at 2-32 (2d ed. Supp. 2024) ("[I]t would seem that the right to store

USM does not take direct issue with these precedents. Instead, it seeks to limit them to migratory minerals like oil and gas. USM essentially concedes that the space left behind by the migration or extraction of flowing minerals like oil and gas belongs to the surface estate, but it contends that a different rule must apply to solid minerals like salt. In USM's view, the many indications in our precedent that subsurface spaces belong to the surface estate are derived from considerations unique to oil and gas. One such consideration is the tension between the rule of capture and the notion that the mineral estate includes ownership-in-place of the minerals under the land. We addressed that tension in *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 15 (Tex. 2008) (internal quotations and citations omitted):

> While a mineral rights owner has a real interest in oil and gas in place, this right does not extend to specific oil and gas beneath the property; ownership must be considered in connection with the law of capture, which is recognized as a property right as well. The minerals owner is entitled, not to the molecules actually residing below the surface,

---

gas produced from a stratum other than the one in question is . . . a right that belongs more properly to the surface estate than the mineral estate."); 1 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW § 222(b), at 332, 335 (2d ed. Supp. 2024) ("[A] mineral estate is really not the same as a surface estate in that it gives the mineral estate owner only limited rights to exploit the minerals including the right to use pore space while leaving the surface estate owner as the corporeal owner of both the space and the rock . . . ."; "It does not appear reasonable to imply surface and subsurface easements in connection with injection or production of injected substances originating from other lands."); 1 EUGENE A. KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 2.6(c), at 73 (1st ed. 1987) ("The owner of the land has the right to use such land for all lawful purposes which, in the absence of regulations controlling land use, would include using the land for subsurface storage of gas and other substances.").

but to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind.

As USM sees it, *Coastal Oil*'s statement that the mineral owner is not entitled "to the molecules actually residing below the surface" has no application to solid minerals like salt, which do not migrate and are therefore not subject to the rule of capture. USM thus asserts unqualified ownership and control of "the molecules [of salt] actually residing below the surface," a right that it acknowledges would not apply to oil and gas but that, it contends, should apply to solid minerals like salt or coal. More specifically, USM asserts ownership of the salt *formations* themselves. USM argues that if it improves its salt formations by creating useable caverns within them, then the caverns are simply a part of the salt formations it already owns, and so it owns the caverns just as surely as it owns the salt.

USM is correct, to an extent, that our precedent regarding ownership of subsurface spaces was conceived in the context of oil and gas development, not in the context of mining solid minerals. And USM points to precedents from heavy coal-mining states that lend some support to its position. *See, e.g.*, *Middleton v. Harlan-Wallins Coal Corp.*, 66 S.W.2d 30, 31–32 (Ky. 1933) (holding coal owner had right to use cavern created by mining so long as mineable coal remained); *Lillibridge v. Lackawanna Coal Co.*, 22 A. 1035, 1039 (Pa. 1891) (holding coal owners, not surface owners, owned mining shafts created by removal of coal).

USM is also correct that the only Texas case dealing specifically with ownership of salt caverns supports its position. *See Mapco*, 808 S.W.2d at 274. In *Mapco*, the court of appeals held that a

11

mineral-estate owner retains a property interest in the underground storage caverns created by salt mining and is entitled to compensation for use of the caverns. *See id.* at 277–78. This Court reversed the judgment on other grounds. *Mapco*, 817 S.W.2d at 688. The court of appeals' opinion in *Mapco* is difficult to parse and cites little Texas authority for its key holding. It has not often been cited, and commentators consider it the minority view.[2] We do not find *Mapco*'s reasoning persuasive, and to the extent it is inconsistent with our holding today, it is overruled.

Nevertheless, USM's position is not without intuitive appeal, and it is not difficult to see why the court of appeals in *Mapco* would have thought its holding a reasonable one, particularly before *Lightning Oil*. A rule under which the owner of an underground salt formation maintains ownership of valuable caverns it created by its own labor would strike few observers as altogether unjust or unreasonable.

We need not attempt to precisely define every contour of USM's mineral estate, however, in order to decide the question of which party

---

[2] *See* John B. McFarland & Nicholas C. Miller, *Saltwater Disposal Well Leasing: High Waters Float All Boats*, TEX. STATE BAR ADV. OIL, GAS & ENERGY RES. L. COURSE § 2.2 (Sept. 2013) ("*Mapco* represents an outlier . . . . The common understanding in Texas, and what the industry relies on, is that the right to use land for subsurface disposal is an incident of ownership of the surface estate."); Owen L. Anderson, *Geologic CO2 Sequestration: Who Owns the Pore Space?*, 9 WYO. L. REV. 97, 106 (2009) ("Notwithstanding *Mapco*, surface owners have the stronger argument for ownership of pore spaces . . . ."); Tyler Roberts, Note, *Pore Texas: Defining the Ownership of Pore Space for Carbon Capture and Sequestration in Texas*, 19 TEX. J. OIL GAS & ENERGY L. 112, 132 (2024) ("*Mapco* is the only case in Texas where the mineral estate owner was recognized as having *any* subsurface storage rights.").

owns the empty spaces encased in salt under these 160 acres in Matagorda County. We can assume, for instance, that USM correctly asserts unqualified title to the particular molecules of salt under the ground—rather than simply the right to "a fair chance to recover" the salt. *Coastal Oil*, 268 S.W.3d at 15. Nor must we decide for all purposes whether the law will treat solid minerals just as it treats migratory minerals like oil and gas.

These and other potential complexities aside, two simple considerations counsel us to reject USM's claimed ownership of the empty spaces within the salt formations. First, USM does not own the salt *formations*. At most, it owns the *salt*. Its predecessor obtained the "oil, gas and other minerals in, on and under said land" in 1947. USM then obtained, in 2008, "all of [the mineral-estate holder's] right, title and interest, in and to all of the salt and salt formations." USM highlights the 2008 deed's reference to "salt formations," from which it gathers that it owns not just the salt itself but also other geologic features, including voids, contained within the salt formations. As the court of appeals correctly observed, however, "[USM's] predecessor did not receive a conveyance of the salt formations." 699 S.W.3d at 19 n.17. It is axiomatic that "a grantor cannot convey to a grantee a greater or better title than [he] holds." *Cox v. Gutman*, 575 S.W.2d 661, 664 (Tex. App.—El Paso 1978, writ ref'd n.r.e.). USM's predecessor received a conveyance of the "minerals," which includes the salt itself but does not include non-salt portions of a "salt formation." Thus, the most USM could have obtained from its predecessor is ownership of the salt itself—

13

not ownership of a "salt formation," and not ownership of non-salt substances or spaces adjacent to the salt.

Put more simply, despite its apparent complexity, much of this case boils down to the elementary observation that empty space is not salt. No matter who created the underground empty space or where it is located, the space itself is not salt, which means the mineral estate generally does not entail physical ownership of it (absent some indication to the contrary in the conveyance, which we do not see here). This brings us to the second consideration counseling our rejection of USM's position. As indicated above, we consider Texas law reasonably clear that underground storage space generally belongs to the surface owner absent a contrary agreement. *Supra* at 8–9. But if USM is correct, then there would be one rule for underground storage space encased in salt or other mineral formations and another rule for underground storage space encased in non-mineral rock formations. We are not equipped to anticipate all the practical consequences of inserting such a distinction into the law. Perhaps they would be few. Perhaps they would be many. But we should always prefer, where possible, to stick with simple, bright-line rules and to apply them consistently across a variety of fact patterns. And we should always avoid, where possible, inviting greater complexity and uncertainty into the law by drawing ever finer distinctions in an effort to account for the factual vagaries that so often test the edges of bright-line rules.

We therefore hold, once again, that "the surface owner, and not the mineral lessee, owns the possessory rights to the space under the property's surface," absent an agreement otherwise. *Regency Field*

*Servs.*, 622 S.W.3d at 820 (citing *Lightning Oil*, 520 S.W.3d at 47). Applying that rule here, Myers as the surface owner—not USM as the mineral owner—owns the space under the property's surface, including the space contained within hollowed-out salt formations.

**B.**

Having rejected USM's claimed ownership of the space within the salt caverns, we turn to its claimed right to access and use that space as the holder of the "dominant" mineral estate. On this point, the law is clear. If Myers owns the space as part of the surface estate, as we hold above, then USM may still have a right to use it, but that right is a limited one. "The severed mineral estate has the implied right to use as much of the surface estate as reasonably necessary to produce and remove minerals." *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016). "[T]he mineral estate is called 'dominant' and the surface estate 'servient', not because the mineral estate is in some sense superior, but because it receives the benefit of the implied right of use of the surface estate." *Id.* The mineral owner's right in this regard extends not only to the surface of the land but also to the use of those portions of the subsurface retained by the surface estate. Thus, as we observed in *Lightning Oil*, the mineral owner may "use as much of the surface—and subsurface—as is reasonably necessary to recover its minerals." 520 S.W.3d at 50.

USM therefore has a qualified right to use Myers's surface estate, including the disputed salt caverns. That right, however, is limited to uses that are "reasonably necessary to recover [USM's] minerals." *Id.* In other words, USM "is entitled to make reasonable use of the [cavern

space]," but it may only do so "for the production of [its salt]." *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971).

USM has not demonstrated that storage of hydrocarbons produced elsewhere is reasonably necessary to recover its salt. Indeed, it seems more likely that storage of hydrocarbons within salt caverns would hinder, rather than facilitate, further production of the salt. Such a storage operation would likely entail invasive uses of the surface estate as well. But ownership of the mineral estate does not entitle "the mineral owner to increase the burden on the surface estate for the benefit of additional lands." *Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 868 (Tex. 1973). While the mineral owner may make use of the surface estate as reasonably necessary to produce its minerals, the "owner of the surface is entitled to protection from uses thereof, without his consent, for the benefit of owners outside of and beyond" the property. *Id.*

USM does not argue that storage of off-site minerals on Myers's land is authorized by the conveyances or is reasonably necessary for USM's production of salt from the property. Its claimed right to use the caverns flows, instead, from its claimed right to unqualified ownership and enjoyment of the salt formations, including the empty spaces within them. USM's primary contention is that its ownership of the salt formations includes a right to make use of them as it sees fit. That argument having failed, *supra* at 7–15, USM cannot establish a right to use the salt caverns because its proposed use of them has no connection to the production of salt on the property.

For these reasons, the judgment of the court of appeals regarding the ownership and use of empty spaces within the salt caverns is affirmed.

## III.

Turning to the royalty dispute, the parties have disagreed throughout their relationship over how to calculate Myers's royalty on salt produced by USM. The 1947 correction deed reserves "a royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from the above described land." Myers contends that this language reserves an in-kind royalty, under which Myers is entitled either to physical possession of 1/8th of the salt produced from its land or is entitled to 1/8th of the net proceeds from USM's sale of that very salt.[3] USM disagrees. It argues that the royalty entitles Myers not to 1/8th of the net proceeds from the sale of any *particular* salt—but instead to 1/8th of the market value of the *amount* of salt produced from the land. The lower courts agreed with USM. We do not.

We begin by noting the curious nature of the dispute. USM contends that 1/8th of the salt's market value is roughly $260,000—the amount determined by the district court. USM does not proffer a dollar figure for 1/8th of the net proceeds of its actual sale of the salt to Formosa Plastics. Myers's calculation of that number is more than

---

[3] Physical possession is not at issue because the salt has already been sold, so we focus on Myers's alleged entitlement to 1/8th of the net proceeds from the sale of the salt. Myers concedes that it is entitled only to a share of the *net* proceeds, not the gross proceeds, which means it must bear its proportional share of the post-production costs incurred by USM to make the salt marketable prior to its sale.

17

$2,000,000—over seven times the market-value number USM defends. *See* Myers-Woodward, LLC's Brief on the Merits at 9.

Thus, the confounding premise of the dispute is that there is somehow an enormous discrepancy between the salt's market value and the price for which USM sold the salt. This is not an impossibility, of course. Our precedent acknowledges the economic reality that a mineral's market value and the price paid for it in a given transaction can diverge. *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 372 (Tex. 2001). But our precedent also assumes that there is generally some connection between the two measures, such that one can often yield a useful approximation of the other. *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 388–89 (Tex. 2021) ("[T]he workback method permits an estimation of wellhead market value by using the proceeds of a downstream sale and subtracting postproduction costs incurred between the well and the point of sale.").

Particularly when the price of a mineral is very volatile, sales under a long-term contract could diverge significantly from the mineral's current market value. Salt, however, is usually not such a mineral. Its value during the disputed time period was fairly stable, which makes the parties' wildly divergent calculations of Myers's royalty all the more remarkable.[4]

---

[4] *See Producer Price Index by Commodity: Chemicals and Allied Products: Rock Salt*, FED. RSRV. BANK OF ST. LOUIS, (last updated Mar. 13,

18

In any event, the parties agree that resolution of their dispute turns on the meaning of the corrected 1947 mineral deed, which reserves "a royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from the above described land." The question, as framed by both parties, is this: Does this deed reserve an in-kind royalty such that Myers is entitled to 1/8th of the minerals actually produced from its land (or the net proceeds of their sale), or does the deed merely entitle Myers to be paid 1/8th of the market value of the volume of minerals produced? Although the royalty clause at issue does not appear to be particularly unusual, neither of the ably represented parties cites a Texas case confronting this precise question in the context of a similarly worded conveyance.[5]

Despite the dearth of precedent, we need not develop any new, generally applicable rules to resolve the parties' dispute. The only rule needed is not particular to the construction of mineral deeds. It is instead the foundational rule of contract law—equally applicable when construing mineral conveyances—that "our task is to ascertain the

2025), https://fred.stlouisfed.org/series/WPU06130271.



---

[5] *See* Respondents' Brief on the Merits at 20 (citing a Kentucky case, "absent Texas precedent directly on point").

parties' intentions as expressed in the [document]." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "Although mineral transactions are subject to certain presumptions that state the 'usual' rules, we have repeatedly affirmed that parties are free to make their own bargains, and courts are obligated to enforce agreements *as the parties intended*." *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 696 (Tex. 2022) (emphasis added).

"We discern that intent from the language the parties used to express their accord, viewed not in isolation, but in context." *Id*. "To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Heritage*, 939 S.W.2d at 121. Examination of the entire 1947 transaction, including the original deed and the correction deed that followed just three months later, makes clear that Myers's position better reflects the intent of the parties to these instruments.

The parties agree that the key question is whether Myers's royalty is payable in-kind. We hold that it is. We begin by noting that Myers's understanding of its royalty—as an in-kind royalty—is not inconsistent with a natural reading of the deed's language. As described in the 1947 correction deed, the grantors reserved "a royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from the above described land." Myers reads "a royalty of 1/8 of all the . . . other minerals . . . that may be produced from the above described land" to indicate that Myers has an ownership interest in a 1/8th portion of the actual, physical salt removed from the ground on its

20

property. We see nothing in the conveyance that conflicts with this understanding of the disputed clause. In other words, the deed's language does not foreclose the meaning Myers advances. We need not, however, hold that *any* such clause *always* conveys an in-kind royalty—as Myers urges us to do—in order to conclude that Myers has the correct understanding of this particular 1947 conveyance read as a whole.

The parties agree on one point that advances our analysis. USM contends that "a defining characteristic of an in-kind royalty is explicit language requiring *delivery* of the oil or minerals," and it places great weight on the absence of "delivery" language from the 1947 correction deed. Respondents' Brief on the Merits at 14 (emphasis added). Myers agrees that "delivery" language signals an in-kind royalty, though it maintains that the absence of such language is not decisive in the way USM suggests. The parties are therefore aligned on this key point: Deed language contemplating delivery of the production to the royalty holder creates an in-kind royalty.

It follows, then, that the *oil* royalty conveyed in the original 1947 deed is an *in-kind* royalty. The original deed, executed in May 1947, reserved "a perpetual one-eighth (1/8th) royalty on all the oil that may be produced and saved from" the property, "the same to be delivered at the wells or to the credit of Grantors . . . into pipe line to which the wells may be connected." The parties do not separately analyze this provision, but their arguments leave no doubt that they agree it reserves an in-kind oil royalty by providing that the royalty holder's share may "be delivered at the wells."

In addition to the in-kind oil royalty reserved in the May 1947 deed, the August 1947 correction deed—which we analyze in more detail below—reserves "a royalty of 1/8 of all the gas or other minerals." The dispute is whether this royalty on "other minerals" is payable in-kind. USM maintains that, although the May 1947 deed reserved an in-kind royalty for oil, the August 1947 correction deed reserved a different kind of royalty—payable solely based on market value—for gas and other minerals. Myers, on the other hand, would interpret all the royalties— whether for oil, gas, or other minerals—as similar, in-kind royalties. Examining all the relevant provisions in context, we conclude that Myers's position reflects the parties' intent as expressed in these documents.

The correction deed was executed in August 1947 to remedy, in its own words, the parties' "inadvertent" failure three months earlier to "include any reservation of royalty interest in gas or other minerals" in the original deed. The correction deed then provided, as relevant here:

> The aforesaid mineral deed of May 17, 1947, shall be, and it is hereby, amended so as to provide that in addition to the royalties on oil and sulphur therein reserved, the Grantors, Barbara and Howard Smith, shall be entitled to a royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from the above described land and the said Claud B. Hamill does hereby grant to the said Barbara and Howard Smith such royalty interest, it being intended that they shall receive a total royalty interest of 1/8 of all the oil, gas, or other minerals (except sulphur) produced from said land . . . .

USM hangs its hat on the fact that the correction deed's reservation of a royalty on "other minerals" (which includes salt) contains neither "delivery" language nor any express mention of an

in-kind royalty. A problem for USM, however, is that the correction deed describes the in-kind *oil* royalty in *exactly* the same way as it describes the royalty on gas and other minerals. The correction deed declares the parties' overall intent "that [the royalty holders] shall receive a total royalty interest of 1/8 of all the oil, gas, or other minerals (except sulphur) produced from said land." If, as USM contends, this language cannot support an in-kind royalty because it lacks a "delivery" provision, then the correction deed either mischaracterizes the oil royalty or amends it. We find neither of those possibilities likely.

Rather, examination of the entire correction deed in its context indicates that the parties intended to create identical royalties for all three categories—oil, gas, and other minerals—and they executed the correction deed because they had inadvertently neglected to include gas and other minerals in the *in-kind* oil royalty created by the original deed. The correction deed gives no indication that the parties intended the three categories of royalty to be calculated in divergent ways or that they intended to make any other distinctions between the three categories. To the contrary, the parties grouped the three categories together and described the net effect of their transaction, without mentioning any distinctions, as "a total royalty interest of 1/8 of all the oil, gas, or other minerals produced from said land." The oil royalty is clearly an in-kind royalty, and the parties, by their correction deed, sought to add gas and other minerals to their pre-existing in-kind oil royalty. We see nothing in these documents supporting the notion that the royalty on "other minerals" should not be treated just like the in-kind oil royalty to which the parties unquestionably agreed.

USM claims that Myers waived its support for an in-kind royalty by asking, in a summary judgment motion, for "1/8 of the market value at the point of production of all salt from the land." According to USM, this request invited the error of which Myers now complains and waived Myers's argument that the salt royalty is an in-kind royalty. We disagree. By the time Myers filed the summary judgment motion in question, the district court had already definitively rejected Myers's arguments for an in-kind royalty. Parties need not re-urge, at every succeeding stage of the proceedings, arguments the district court has already rejected. *See In re Est. of Phillips*, 700 S.W.3d 428, 431 (Tex. 2024). Myers did not waive its initial position by retreating to a fallback position in an attempt to get *some* relief when it became clear the district court would not award the greater relief Myers initially sought. Myers presented its argument for an in-kind royalty to the district court, the court rejected that argument, and the issue is now properly before us on appeal of a judgment adverse to Myers on the issue.

## IV.

The bench trial on Myers's entitlement to royalty payments proceeded from the mistaken premise that market value was the only appropriate measure of Myers's royalty. This error appears to have affected the district court's rulings on other issues of which Myers complains—including evidentiary rulings, rulings on the admission or exclusion of expert testimony, and Myers's claim for breach of the implied marketing covenant. Without comment on these additional matters, we reverse the judgment of the court of appeals in part and

24

remand the case to the district court for further proceedings under the legal standards described in this opinion.

The court of appeals' judgment is affirmed as to ownership of the space within the salt caverns. The court of appeals' judgment is reversed as to the amount of royalty owed to Myers. The case is remanded to the district court for further proceedings consistent with this opinion.

James D. Blacklock
Chief Justice

**OPINION DELIVERED:** May 16, 2025